**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DOE,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 1:26-cv-01557-CRC** |
| | : | |
| **THE ISLAMIC REPUBLIC OF IRAN** | : | |
| | : | |
| **Defendants.** | : | |

# PLAINTIFF'S MOTION FOR ALTERNATIVE SERVICE BY ELECTRONIC MAIL UPON DEFENDANT ISLAMIC REVOLUTIONARY GUARD CORPS AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF AUTHORITIES

## CASES

*_Holladay v. Islamic Republic of Iran_, 523 F. Supp. 3d 100 (D.D.C. 2021) (Holladay II) .. passim

*_Mahvi v. Islamic Republic of Iran_, No. 1:25-cv-00059-TNM-MAU (D.D.C. June 18, 2026)4, 36

*_New England Merchs. Nat'l Bank v. Iran Power Generation & Transmission Co._, 495 F. Supp. 73 (S.D.N.Y. 1980) ........ 23, 24, 27, 35

*_Rimkus v. Islamic Republic of Iran_, 575 F. Supp. 2d 181 (D.D.C. 2008) (Rimkus I) ......... passim

*_Roeder v. Islamic Republic of Iran_, 333 F.3d 228 (D.C. Cir. 2003)........ 9, 11

*_Transaero, Inc. v. La Fuerza Aerea Boliviana_, 30 F.3d 148 (D.C. Cir. 1994)........ passim

_Angellino v. Royal Family Al-Saud_, 688 F.3d 771 (D.C. Cir. 2012) ........ 25

_Azadeh v. Gov't of the Islamic Republic of Iran_, No. 16-cv-1467, 2018 WL 4232913 (D.D.C. Sept. 5, 2018) ........ 8, 13, 26

_Barot v. Embassy of the Republic of Zambia_, 785 F.3d 26 (D.C. Cir. 2015) ........ 25, 26

_Ben-Rafael v. Islamic Republic of Iran_, 540 F. Supp. 2d 39 (D.D.C. 2008) ........ 25

_Blais v. Islamic Republic of Iran_, 459 F. Supp. 2d 40 (D.D.C. 2006) ........ 19

_Boddie v. Connecticut_, 401 U.S. 371 (1971) ........ 31

_Brewer v. Islamic Republic of Iran_, 664 F. Supp. 2d 43 (D.D.C. 2009) ........ 8

_Cleveland Bd. of Educ. v. Loudermill_, 470 U.S. 532 (1985) ........ 30

_Dehnoushi v. Islamic Republic of Iran_, No. 25-cv-2109, 2026 WL 1786419 (D.D.C. June 22, 2026) ........ 5, 7, 9, 26

_Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria_, 225 F. Supp. 3d 18 (D.D.C. 2014) ........ 33

_Fritz v. Islamic Republic of Iran_, 320 F. Supp. 3d 48 (D.D.C. 2018) ........ 6

_Hammond Packing Co. v. Arkansas_, 212 U.S. 322 (1909)........ 30

_Holladay v. Islamic Republic of Iran_, 406 F. Supp. 3d 55 (D.D.C. 2019) (Holladay I)....... 5, 6, 13

_Holland v. Islamic Republic of Iran_, 496 F. Supp. 2d 1 (D.D.C. 2005) ........ 12, 19

_Hutan v. Islamic Republic of Iran_, No. 1:25-cv-00837-ACR (D.D.C. Apr. 16, 2026) ........ 4, 36

_John Farshid Doe v. Islamic Revolutionary Guard Corps_, No. 1:26-cv-00334 (CJN) (D.D.C. June 9, 2026)........ 4, 22, 36

_Logan v. Zimmerman Brush C_o., 455 U.S. 422 (1982) ........ 29, 30, 35

_Magness v. Russian Fed'n_, 247 F.3d 609 (5th Cir. 2001) ........ 28

_Mark v. Republic of the Sudan,_ 77 F.4th 892 (D.C. Cir. 2023) ........ 32

_Mullane v. Cent. Hanover Bank & Tr. Co._, 339 U.S. 306 (1950) ........ 23, 24

_Mwani v. bin Laden_, 417 F.3d 1 (D.C. Cir. 2005)........ 10

_Once Doe v. Islamic Republic of Iran_, No. 1:26-cv-02507-MAU (D.D.C. Aug. 31, 2026).. passim

_Petrol Shipping Corp. v. Kingdom of Greece_, 360 F.2d 103 (2d Cir. 1966) ........ 33

*Przewozman v. Islamic Republic of Iran*, 628 F. Supp. 3d 307 (D.D.C. 2022) ........................ 6, 25

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) .................................................... 17

*Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010) (Rimkus II) ................. 18

*Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002) ................................... 24, 27

*Société Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197 (1958) ........................................................................................ 30, 32, 35

*Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478 (1988) ........................................ 29, 31

**STATUTES**

28 U.S.C. § 1603(d) ......................................................................................................... 10

28 U.S.C. § 1605A ......................................................................................................... 6, 31

28 U.S.C. § 1608 ......................................................................................................... passim

**OTHER AUTHORITIES**

Clayton Thomas, Cong. Rsch. Serv., R47321, Iran: Background and U.S. Policy (May 22, 2025) ......................................................................................................... passim

* Authorities upon which counsel chiefly relies. LCvR 7(a).

INTRODUCTION

Plaintiff Ocho Doe respectfully moves for an order authorizing service upon Defendant the Islamic Revolutionary Guard Corps ("IRGC") by electronic mail, together with a Farsi translation of each document, pursuant to 28 U.S.C. § 1608(b)(3)(C). This motion is directed to the IRGC alone. Plaintiff does not by this motion seek relief as to the Islamic Republic of Iran ("Iran") or the Ministry of Intelligence and Security ("MOIS"), and Plaintiff continues to pursue service upon those Defendants under 28 U.S.C. § 1608(a). Plaintiff's counsel has requested, and three other judges of this District have granted, the relief sought here in four similar cases. *See Once Doe v. Islamic Republic of Iran*, No. 1:26-cv-02507-MAU, Minute Order (D.D.C. Aug. 31, 2026) (Ex. H); *Mahvi v. Islamic Republic of Iran*, No. 1:25-cv-00059-TNM-MAU, Minute Order (D.D.C. June 18, 2026) (Ex. G); *John Farshid Doe v. Islamic Revolutionary Guard Corps*, No. 1:26-cv-00334 (CJN), Order (D.D.C. June 9, 2026) (Ex. F); *Hutan v. Islamic Republic of Iran*, No. 1:25-cv-00837-ACR, Minute Order (D.D.C. Apr. 16, 2026) (Ex. E).

This motion should be granted on either of two independent grounds. First, the IRGC is an agency or instrumentality of a foreign state, not the foreign state itself, and § 1608(b)(3)(C) expressly authorizes the Court to direct a method of service reasonably calculated to give it actual notice. Second, and independently, if § 1608(a) governs, every method that provision prescribes is presently unavailable, and this Court's own precedent authorizes a substitute in those circumstances.

The first ground rests on a factual record no prior motion in this District has presented. The Congressional Research Service reports that the IRGC "is a parallel military institution to Iran's regular armed forces, plays a major unofficial role in Iran's economy, and is responsible

for regime security."[1] The Department of State has found that the IRGC "exerts control over a vast swath of Iran's economy through an extensive network of front companies and the Bonyad Taavon Basij."[2] A founder of the IRGC has sworn that the organization evolved "from a national guard to 'an organized crime syndicate'" controlling "more than 100 different economic enterprises." *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 199–200 (D.D.C. 2008) (*Rimkus I*). Parts III.A through III.C set out that record in full.

However, not all judges of this District agree that the IRGC should be treated as the foreign state itself and served under § 1608(a). Judge Moss so held in a case brought by this firm. *Dehnoushi v. Islamic Republic of Iran*, No. 25-cv-2109, 2026 WL 1786419 (D.D.C. June 22, 2026). He did, however, give Plaintiff's counsel leave to refile the motion in order to set forth why his prior denials of alternative service were incorrect, and Plaintiff's counsel have engaged further in that colloquy.

Two things distinguish this motion. First, it does not ask this Court to hold that the D.C. Circuit misread the Foreign Sovereign Immunities Act ("FSIA"). That argument was made and rejected in *Dehnoushi*, and Plaintiff does not renew it. Plaintiff accepts *Transaero* and *Roeder* as binding and argues within them. Second, and more importantly, the governing test is a factual one, and this Court has twice declined to classify a dual-function Iranian entity without an adequate record and then, when the record was supplied, classified two such entities as agencies or instrumentalities under § 1608(b). *Compare Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 60 (D.D.C. 2019) (*Holladay I*), *with Holladay v. Islamic Republic of Iran*, 523 F. Supp. 3d 100, 110–13 (D.D.C. 2021) (*Holladay II*). Plaintiff supplies that record here.

---

[1] Clayton Thomas, Cong. Rsch. Serv., R47321, *Iran: Background and U.S. Policy* (May 22, 2025) (Ex. E-10 at 7).

[2] U.S. Dep't of State, Bureau of Econ. & Bus. Affairs, *Iran Fact Sheet per Commercial Sector* (Dec. 18, 2018), https://2017-2021.state.gov/iran-fact-sheet-per-commercial-sector/ (Ex. E-4).

# I. BACKGROUND

## A. Procedural History

Plaintiff filed this action on May 6, 2026 under the terrorism exception to the FSIA, 28 U.S.C. § 1605A, alleging a twenty-seven-year transnational campaign of torture, hostage taking, death threats, surveillance, harassment, intimidation, and physical violence directed at him, a naturalized United States citizen and Persian-language journalist, in retaliation for his reporting on the Islamic Republic. On June 2, 2026, the Court granted Plaintiff leave to proceed under pseudonym. The case was assigned to this Court on June 5, 2026, and the Clerk issued three summonses that same day. On July 10, 2026, Plaintiff moved for alternative service by electronic mail as to all three Defendants; on July 15, 2026, in light of intervening authority, Plaintiff withdrew that motion without prejudice and has since continued to pursue service under 28 U.S.C. § 1608(a).

## B. The Classification Question Turns on the Record, and the Record Here Is New

Judges of this District have held that the IRGC is the foreign state itself for purposes of § 1608. In *Holladay I*, the Court held that Iran, the IRGC, and MOIS are all "subject to service under § 1608(a) as 'the foreign state or [a] political subdivision' thereof," reasoning that "IRGC, as a branch of the Iranian Armed Forces, performs a military function" and is therefore "so closely bound up with the structure of the state" as to be the state itself. 406 F. Supp. 3d at 59–60 (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994)); *accord Przewozman v. Islamic Republic of Iran*, 628 F. Supp. 3d 307, 313 (D.D.C. 2022); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018). *Holladay I* did not engage in an economic analysis of the IRGC.

*Holladay II* supplies the framework that governs when a party does present that analysis. On a renewed motion in the same case, Judge Moss classified the National Iranian Oil Company and Bank Markazi as agencies or instrumentalities under § 1608(b) on supplemented expert

records. 523 F. Supp. 3d at 110–13. Two holdings control here. First, "it is not the purpose, but the nature, of the activity that controls," so an entity's commercial character is not defeated by the fact that its revenue funds the state: "most — if not all — successful, government-owned enterprises generate revenue for the government." *Id.* at 110. Second, the burden is a "prima facie showing," and the Court called it a "low bar," classifying Bank Markazi as an instrumentality even though "the exact proportion of the bank's activities that are properly considered commercial, as compared to those that are best viewed as governmental, remain[ed] opaque." *Id.* at 111–12.

In *Dehnoushi*, Plaintiff, represented by undersigned counsel, moved for email service on the IRGC and MOIS under § 1608(b)(3)(C). Judge Moss, who authored *Holladay I* and *Holladay II*, denied the motion without prejudice, holding that "[t]his Court . . . remains bound by the D.C. Circuit's reading of the statute unless and until the Circuit elects to revisit it," 2026 WL 1786419, at *2, and that the IRGC's designation as a terrorist entity under separate statutory authorities did not establish that it is a "distinct entit[y] separate from the Iranian state," *id.* at *2. Critically, the Court observed that the *Dehnoushi* plaintiffs "do not contend that the 'core functions' of either the IRGC or the MOIS are commercial rather than . . . governmental." *Id.* at *1.

This motion is different in four respects.

(1) It is limited to the IRGC. Plaintiff does not seek reclassification of MOIS and does not seek relief as to Iran itself.

(2) It does not argue that the D.C. Circuit misread the FSIA. Plaintiff accepts *Transaero* and *Roeder* as binding and argues within the core-functions test they establish.

(3) It does not rest on the IRGC's Foreign Terrorist Organization designation as the operative fact. Plaintiff agrees with *Dehnoushi* that a designation under separate statutory authority does not itself answer the § 1608 question.

(4) It supplies an evidentiary record on the IRGC's commercial functions, which is precisely what *Dehnoushi* found absent and what *Holladay II* found sufficient. Plaintiff has also filed supplemental briefing in *Dehnoushi* on the commercial sphere of the IRGC, as that court invited him to do.

C. The Statutory Methods of Service Are Presently Unavailable

Service under § 1608(b)(1) is unavailable because Plaintiff is aware of no special arrangement for service between Plaintiff and the IRGC. Service under § 1608(b)(2) is unavailable because Plaintiff is aware of no officer, managing or general agent, or other agent authorized to receive service on the IRGC's behalf in the United States, and because Iran is not a party to any applicable international convention on the service of judicial documents. *See Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 51 (D.D.C. 2009) (finding that "Iran is not a party to any 'international convention on service of judicial documents'").

The practical channels are also closed. The United States Postal Service maintains Iran on its list of countries subject to suspension of international mail service for "unavailability of transportation," and DHL and UPS have each suspended service to Iran. *See* Exs. B–D. That matters: when this Court effected § 1608(a)(3) service on Iran in *Azadeh v. Government of the Islamic Republic of Iran*, the Clerk of Court did so by DHL, and the Clerk's Certificate of Mailing included "a copy of the DHL waybills and tracking numbers for each package." No. 16-cv-1467, 2018 WL 4232913, at *14 (D.D.C. Sept. 5, 2018). No such waybill can issue today. As to diplomatic channels, the Department of State's Judicial Assistance Team confirmed on June 15, 2026 that although the Foreign Interests Section of the Swiss Embassy in Tehran has physically reopened, "there are still no regular diplomatic shipments between Bern and Tehran, which continues to inhibit the ability to transmit documents in either direction." Ex. A. Plaintiff's showing is that the transmission channel on which § 1608(a)(4) depends does not presently function, not that the mission is shuttered.

The § 1608(a)(4) channel does not function even apart from the present hostilities. In *Dehnoushi*, the Department of State has been unable to complete undersigned counsel's request for diplomatic service upon these same Defendants for more than a year. That request predates the armed conflict that began in February 2026, and the Department has still not effected service. The record therefore does not show a channel slowed by war. It shows a channel that did not function before the war began and does not function now.

## II. LEGAL STANDARD

Section 1608 establishes two pathways, and which one applies depends on the nature of the entity served. Section 1608(a) governs service on "a foreign state or political subdivision of a foreign state"; § 1608(b) governs service on "an agency or instrumentality of a foreign state." *Holladay II*, 523 F. Supp. 3d at 105–06. Section 1608(b)(3)(C) permits service on an agency or instrumentality "as directed by order of the court consistent with the law of the place where service is to be made," so long as the method is "reasonably calculated to give actual notice." 28 U.S.C. § 1608(b)(3)(C); *see Dehnoushi*, 2026 WL 1786419, at *1.

Which pathway applies is determined by the core-functions test: "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003); *accord Transaero*, 30 F.3d at 151–53. The question is "whether the core functions of the foreign entity are *predominantly* governmental or commercial." *Transaero*, 30 F.3d at 151 (emphasis added).

*Holladay II* establishes three propositions that control the application of that test. First, the test borrows the FSIA's own definition of commercial character, under which "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 523 F. Supp. 3d at 109 (quoting 28 U.S.C. § 1603(d)).

> "When an entity is an organ of a foreign state or owned by a foreign state, its market activities will often serve public purposes, either by aiming to achieve a policy goal or by seeking to raise revenue for government coffers. But by focusing on the nature of the activity, a court can nevertheless distinguish commercial actions and actors from governmental ones."
> *Id.*

Second, the fact that an entity's revenue funds the state is not disqualifying: even where an entity supplied "between one-third and two-thirds of the Iranian government's total revenue," that "d[id] not undermine the company's status as a government agency or instrumentality," because "most — if not all — successful, government-owned enterprises generate revenue for the government." *Id.* at 110. Third, the standard is a "prima facie showing" based on the pleadings "bolstered by such affidavits and other written materials as [a plaintiff] can otherwise obtain," *id.* at 107 (quoting *Mwani v. bin Laden*, 417 F.3d 1, 6–7 (D.C. Cir. 2005)), which the Court described as a "low bar," *id.* at 111.

The test is therefore fact-bound rather than nominal. Judges of this District are divided over whether particular state-owned entities fall on one side or the other, *id.* at 108, and *Holladay II* classified a central bank as an instrumentality even though central banks "by their nature[] straddle the line between governmental and commercial activity" and "the exact proportion" of commercial activity "remain[ed] opaque," *id.* at 111–12.

## III. ARGUMENT

### A. The IRGC Is Not the Armed Forces of Iran, and *Transaero*'s Per Se Rule Therefore Does Not Reach It

*Transaero*'s categorical rule applies to a nation's armed forces, and the IRGC is not Iran's armed forces. Iran's armed forces are the Artesh. The IRGC is a separate institution that Iran's clerical leadership built alongside the Artesh and against it, and that operates outside the Iranian government's chain of command. Therefore, the predominance test governs this motion, not the *per se* rule.

*Transaero* did two things. It adopted predominance as the general test, and it then exempted one category of entity from case-by-case weighing: "We hold that armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state." 30 F.3d at 153. The holding is framed in terms of the institution: "the armed forces of a foreign sovereign are the 'foreign state' and must be served under section 1608(a)." *Id.*; *see also Roeder*, 333 F.3d at 234 ("A nation's armed forces are clearly on the governmental side."). The rule rests on a premise about what armed forces *are*: that "[t]he 'powers to declare and wage war' are among the 'necessary concomitants' of sovereignty," and that a state acting through "men organized into offices and departments" cannot disclaim its own military. *Transaero*, 30 F.3d at 153.

Congress's own research arm highlights the distinction that Plaintiff draws. The Congressional Research Service reports that the IRGC "is a parallel military institution to Iran's regular armed forces,"[3] and that "Iran's traditional military force, the Artesh, is a legacy of Iran's Shah-era military force. The Artesh exists alongside the IRGC, which Khomeini established in 1979 as a force loyal to the new regime." The two are "parallel forces (each hav[ing] their own land, air, and naval force components)" whose rivalries stem from "uneven access to resources, varying levels of influence with the regime, and inherent overlap in missions and responsibilities."[4] An institution that mimics the designated national military's land, air, and naval components is not that military.

The judicial record of this District establishes the same facts. In *Holland v. Islamic Republic of Iran*, the Court received the trial testimony of terrorism expert Dr. Bruce Tefft:

---

[3] *See* Thomas, *supra* note 1.
[4] Thomas, *supra*, Ex. E-10 at 17.

> "The Ayatollah and the religious government . . . took power in 1979, and they overthrew the shah of Iran at that time and . . . did not trust at all the existing government, the department of defense, the security services and that sort of thing. So to protect themselves against a counterrevolution, they set up their own *parallel shadow military force* and that's the revolutionary guard corps. . . . [I]t is the main body guard of the Islamic Party and the ruling mullahs. *It is not subject to the Ministry of Defense or the regular Iranian army*."

496 F. Supp. 2d 1, 31 (D.D.C. 2005) (quoting 1/19/05 Tr. at 24:3–25:8) (emphasis added). On that record the Court described the IRGC as "a paramilitary organization serving a party—not the state itself—and exist[ing] outside of the control of the regular military." *Id.* at 32–33. Dr. Patrick Clawson, the expert on whose testimony this District has repeatedly relied, likewise defines the IRGC as "the striking arm of the revolution" operating "*parallel to the formal government structure*." *Rimkus I*, 575 F. Supp. 2d at 200 (emphasis added).

The press record is to the same effect. The IRGC "remains a force parallel to that of Iran's regular armed forces," maintaining "naval forces, separate from the naval branch of Iran's regular military," and "an air force . . . also separate from a parallel branch of the regular military."[5] It "operated beyond the bounds of the law and the judiciary," and "its command structure bypasses the elected president."[6] Arash Azizi, a Yale University researcher, explained that the corps "stands for Islamic Revolutionary Guard Corps. A very important word is missing there, and that's Iran. . . . They created it as a force that was not beholden to Iran. IRGC leaders say that they're not even beholden by the Iranian constitution . . . . So they are extralegal and effectively a parallel state."[7]

An entity that is "not subject to the Ministry of Defense or the regular Iranian army," that was created because the state's leadership "did not trust at all" the existing defense

---

[5] CFR Editors, *The Islamic Revolutionary Guard Corps (IRGC)*, Council on Foreign Relations (updated Jan. 30, 2026) (Ex. E-2).

[6] *Id.*

[7] *How Iran's Revolutionary Guard Is Woven Into the State's Power Structure*, NPR (Jan. 18, 2026) (transcript of Weekend Edition Sunday interview of Arash Azizi, researcher, Yale University) (Ex. E-1).

establishment, and that constitutes a "parallel military institution to Iran's regular armed forces" is not "the armed forces of a foreign sovereign" within the meaning of *Transaero*, 30 F.3d at 153. It is a second force standing beside them. To the extent *Holladay I* and *Azadeh* characterized the IRGC as "a branch of the Iranian Armed Forces," 406 F. Supp. 3d at 59; 2018 WL 4232913, at *24, that characterization was assumed rather than litigated: in *Holladay I* it rested on the plaintiffs' own amended complaint, 406 F. Supp. 3d at 59, and in neither case did any party contend that the IRGC is institutionally distinct from Iran's armed forces or submit the material Plaintiff submits here.

B. The IRGC's Core Functions Are Predominantly Commercial

The IRGC's core functions are commercial, and it is therefore an agency or instrumentality of Iran under § 1608(b). Three independent sources place the IRGC's share of Iranian economic output between one-half and two-thirds. Its holdings are a diversified conglomerate spanning oil, banking, telecommunications, construction, transportation, media, and consumer imports, acquired and operated through equity purchases, monopolies, and state contracts. Under *Holladay II*, that showing establishes commercial predominance, and it does so comfortably within the "low bar" of a prima facie case. 523 F. Supp. 3d at 111.

1. The United States Government Has Found That the IRGC Controls a Vast Swath of Iran's Economy

The Department of State has found that the IRGC "exerts control over a vast swath of Iran's economy through an extensive network of front companies and the Bonyad Taavon Basij," and that "[d]ue to a lack of market transparency, it may be difficult or impossible for the international business community to ensure that transactions involving Iran are not assisting the IRGC's malign activities."[8] The Congressional Research Service reports that the IRGC "plays a

---

[8] *See* U.S. Dep't of State, *supra* note 2.

major *unofficial* role in Iran's economy."[9] The Executive Branch and Congress's research arm thus describe the IRGC not as a ministry but as a commercial network operating through front companies and foundations, outside the state's official economic apparatus.

2. The Magnitude of the Commercial Operation Is Established by Converging Estimates

The Center for Strategic and International Studies concluded in 2020 that "the IRGC has become the most powerful controller of all important economic sectors across Iran."[10] Arash Azizi put the corps' control at "about 50% of the Iranian economy," describing the IRGC as "both a militia, a political party and sort of a big corporation or a series of corporations."[11] Experts estimate "the corps' market share as comprising one to two thirds of Iran's Gross Domestic Product."[12] The Clingendael Institute estimated that IRGC-affiliated foundations alone "accounted for more than half of Iran's GDP in 2013."[13] Contemporaneous reporting placed the IRGC in control of "a large portion of the 70% or so of the Iranian economy that is state-run."[14]

These figures exceed what *Holladay II* found sufficient. There, the Court classified the National Iranian Oil Company as an instrumentality where its revenue was "between one-third and two-thirds of the Iranian government's total revenue," holding that revenue generation for the state does not make an entity governmental. 523 F. Supp. 3d at 110.

---

[9] *See* Thomas, *supra* note 1.

[10] *See* CFR Editors, *supra* note 5.

[11] *See* NPR, *supra* note 7.

[12] Graham Owens, *Serious Business: The Iranian Revolutionary Guard Corps and the Sports Industry*, 19 Yale J. Int'l Affs., no. 2 (May 23, 2024), https://www.yalejournal.org/publications/serious-business-the-iranian-revolutionary-guard-corps-and-the-sports-industry (Ex. E-5).

[13] Jason Ma, *Iran's Islamic Revolutionary Guard Controls a Sprawling Business Empire That Dominates the Economy*, Fortune (Mar. 2, 2026), https://fortune.com/2026/03/02/iran-islamic-revolutionary-guard-irgc-business-empire-economy-us-israel-bombing/ (Ex. E-3).

[14] *IRGC Buys Majority Share of Iran Telecom*, Nat'l Iranian Am. Council (Sept. 29, 2009), https://niacouncil.org/irgc-buys-majority-share-of-iran-telecom/ (Ex. E-6).

3. The Breadth of the Commercial Operation Is That of a Diversified Conglomerate

Mohsen Sazegara, a founder of the IRGC, has described the transformation (under oath) of the IRGC "from a national guard to 'an organized crime syndicate'" controlling "more than 100 different economic enterprises." *Rimkus I*, 575 F. Supp. 2d at 199–200. That characterization comes not from a critic outside the organization but from a man who helped create it.

The holdings bear him out. The business empire "includes core industrial sectors like oil and transportation as well as banking, telecommunications, agriculture, medicine, and real estate."[15] Its engineering arm, Khatam al-Anbiya, "has built refineries, a railway line, a dam, and a natural gas pipeline," and "controls Tehran's international airport."[16] The corps has expanded "into many other industries, including banking, shipping, manufacturing, and consumer imports," and "[p]olitical clout secures IRGC-affiliated companies no-bid contracts from the state to service the oil sector and develop infrastructure."[17] It operates through "'foundations' that essentially form semiprivate monopolies,"[18] and through "government-sponsored holding groups called bonyads," which are "often designated as nongovernmental charitable foundations, but in reality employ government support to take over profitable companies or win lucrative contracts."[19]

The record includes discrete transactions of the kind one associates with a holding company rather than a ministry. In September 2009, the E'temad Mobin consortium, two of whose three constituent companies were IRGC-controlled, purchased fifty percent plus one

---

[15] *See* Ma, *supra* note 13.
[16] *Id.*
[17] *See* CFR Editors, *supra* note 5.
[18] *See* Ma, *supra* note 13.
[19] *See* Owens, *supra* note 12.

share of the Telecommunications Company of Iran for $7.8 billion.[20] A parliamentary investigation found that the sale "was conducted with a superficial adherence to regulations and entirely non-competitively," after the only non-IRGC-affiliated bidder was disqualified on security grounds by an unnamed supervisory organ.[21] The company held "a permanent monopoly over telephone lines" and "also controls Iran's home internet infrastructure."[22] The IRGC also "directly controls two prominent media outlets in Iran: Fars News Agency and Tasnim News Agency, both of which were sanctioned by the United States in 2023 for their ties to the guards," and it holds controlling positions in Iran's largest football (soccer) clubs and in the Iranian Football Federation itself.[23]

These are commercial activities in the ordinary sense, and under *Holladay II* that is what matters. Acquiring equity in a telecommunications carrier, operating a monopoly, bidding on and receiving state contracts, owning media properties, and running sports franchises are activities a private party can and does perform. The Supreme Court's formulation, which *Holladay II* applied, asks whether the entity acts "not as regulator of a market, but in the manner of a private player within it." 523 F. Supp. 3d at 112 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)). The IRGC buys companies, wins contracts, and collects revenue, all of which are actions emblematic of a private player. The fact that the proceeds "help finance the regime as well as its own military and ideological agenda"[24] is a question of purpose, and purpose is not the test. *Holladay II*, 523 F. Supp. 3d at 110.

---

[20] *See* Nat'l Iranian Am. Council, *supra* note 14.

[21] Saeed Ghasseminejad, *The IRGC Took Over Iran's Telecoms Industry with a Disinformation Campaign. Then, It Used the Industry to Amplify Its Own Lies*, Iran Disinformation Project (May 2, 2019), https://www.fdd.org/analysis/2019/05/02/the-irgc-took-over-irans-telecoms-industry-with-a-disinformation-campaign-then-it-used-the-industry-to-amplify-its-own-lies/ (Ex. E-7).

[22] *Id.*

[23] *See* Owens, *supra* note 12.

[24] *See* Ma, *supra* note 13.

C. The IRGC Operates Outside the Government of Iran and Is Therefore Not "Bound Up with the Structure of the State"

The IRGC fails *Transaero*'s structural premise as well as its categorical one. *Transaero* treats an entity as the foreign state where it is "so closely bound up with the structure of the state" that separating the two would cause "the structure of section 1608 [to] list too far to one side." 30 F.3d at 153. The IRGC is the inverse case to the Bolivian Air Force in *Transaero*:

(a) its budget sits outside the government's,

(b) it answers to no ministry,

(c) its conglomerates are shielded from state oversight, and

(d) it stands outside the state's own legal and judicial apparatus.

To treat the IRGC as the Government of Iran itself is to mistake the uses the state makes of the organization for the functions the organization performs.

*Transaero* drew the § 1608 line by function and sophistication. Section 1608(a) "mandates service of the Ministry of Foreign Affairs, the department most likely to understand American procedure," whereas agencies and instrumentalities are "typically international commercial enterprises" that "often possess a sophisticated knowledge of the United States legal system that other organs of foreign governments may lack." *Id.* at 154.

The IRGC sits on the § 1608(b) side of that line. Its "finances are not on the government budget, and are free from any state oversight," and "[t]he guard is accountable only to Supreme Leader Ayatollah Ali Khamenei."[25] The IRGC's accountability to the Ayatollah confirms rather than defeats the point. It answers to him, not as head of state, but as supreme custodian of the Shia clerical establishment, serving as a praetorian guard for a clerical order rather than as a

[25] *See* Nat'l Iranian Am. Council, *supra* note 14.

state military.[26] The Clingendael Institute found that the IRGC's foundations "evolved into corporate-style conglomerates that were shielded from oversight and yet central to the power base of the revolutionary state," and that "wealth accumulation . . . became an end in itself."[27] And it is an internationally sophisticated commercial actor of exactly the sort *Transaero* placed under § 1608(b): its "companies linked to the IRGC now operate beyond Iranian borders, drawing income from abroad."[28]

Two decisions of this District have described the IRGC in precisely these terms. In *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010) (*Rimkus II*), Chief Judge Lamberth recorded that the IRGC "has been described by expert testimony as 'a nontraditional *instrumentality* of Iran' that acts as 'the military arm of a kind of shadow government'". *Id.* at 173 (quoting *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 47 (D.D.C. 2006)) (emphasis added). Resolving the jurisdictional question, the Court drew the line Plaintiff draws here: "MOIS is a division of the state of Iran, while IRGC is an *instrumentality* of Iran that acts as a military arm of the government." *Id.* at 180 (emphasis added). And in *Holland*, Judge Kollar-Kotelly found that "the IRGC . . . appears to be a true 'instrumentality' of the dominant party of the state, used by the government and its officials in largely 'illegal,' paramilitary, and sub rosa activities to supplement the goals of its official agencies and foreign policy needs," and stated

[26] Mark D. Silinsky, *Iran's Islamic Revolutionary Guard Corps: Its Foreign Policy and Foreign Legion*, Expeditions with MCUP (Sept. 16, 2019), https://www.usmcu.edu/Outreach/Marine-Corps-University-Press/Expeditions-with-MCUP-digital-journal/irans-Islamic-Revolutionary-Guard-Corps/ (Ex. E-11). The study, published by Marine Corps University Press, adopts the same characterization, describing the IRGC as the "praetorian guard" by which "Iran's leadership is kept in power." It further records that Ayatollah Khomeini "dreamed of a 20-million-strong army of pious Shia youth recruited from a highly vetted grid of seminaries and universities to create a 'new Islamic civilization.'" That recruitment design is itself significant. The force was drawn from the clerical establishment's own institutions rather than from the conscription and command structures of the Iranian state, producing an ideological elite loyal to the clerical architecture that created it. (Ex. E-11).

[27] *See* Ma, *supra* note 13.

[28] Ariane Tabatabai, *Where Does the Islamic Revolutionary Guard Corps Stand on Nuclear Negotiations?*, Bull. Atomic Scientists (Mar. 11, 2015), https://thebulletin.org/2015/03/where-does-the-islamic-revolutionary-guard-corps-stand-on-nuclear-negotiations/ (Ex. E-8).

that she was "much more hesitant than these courts to conclude that the IRGC is actually equivalent to 'the foreign state itself' — i.e., Iran." 496 F. Supp. 2d at 32.

The Iranian government's own officials describe the same relationship, where the IRGC acts without oversight from the government and the government has an inability to control the IRGC. On May 31, 2026, Iran International reported that President Masoud Pezeshkian had submitted a letter of resignation stating that "the president and the government have effectively been excluded from major and vital decision-making processes in the country," and that the resulting vacuum "has enabled hardline factions within the IRGC to take control of affairs."[29] An organization that has displaced the head of government from national decision-making is not a department of that government.

D. *Rimkus I* Invites This Showing, and *Holladay II* Supplies the Standard It Left Unmet

*Rimkus I*, the decision closest to this question, denied reclassification for want of *affirmative evidence* and measured each successive record against the last. It therefore invites the motion Plaintiff files. And the reasoning on which it rested — that commercial activity does not count where the IRGC turns its paramilitary status to profit — has since been displaced by *Holladay II*, which holds that purpose is irrelevant and only the nature of the activity controls.

The framing is *Rimkus I*'s own. Surveying the prior decisions, the Court explained that "plaintiffs' attempts to obtain punitive damages against the IRGC failed because plaintiffs *lacked affirmative evidence* that the IRGC's core functions are commercial." 575 F. Supp. 2d at 199 (emphasis added). As to its own record, it held that "the evidence submitted in the instant

---

[29] *Iran's President Offers Resignation, Citing Total Takeover by IRGC Commanders*, Iran International (May 31, 2026), https://www.iranintl.com/en/202605312204 (Ex. E-9). The report was refuted by the IRGC-affiliated Tasnim News Agency, citing an unnamed government source. *Id.* Plaintiff offers the report for the undisputed background it supplies: that there have been "months of tensions between the government and the Islamic Republic's military-security institutions," and that the IRGC "had gradually restricted many presidential powers and effectively taken control of key parts of the government." *Id.*

case of the IRGC's commercial activities — while more detailed than in earlier cases — remains insufficient for this Court to reach the conclusion that the IRGC is a commercial entity." *Id.* That is a holding about the sufficiency of a record. The Court also confirmed that "[t]he plaintiff bears the burden of proving that the entity is commercial." *Id.* Plaintiff accepts that burden and carries it.

The record *Rimkus I* weighed was a December 21, 2007 Clawson affidavit describing "engineering businesses, smuggling operations, and commercial activities in the oil and gas sector," together with the Sazegara affidavit. *Id.* at 199–200. The record here is different in kind. It includes an affirmative finding by the United States Department of State, published a decade after the Clawson affidavit.[30] It includes a Congressional Research Service report to the same effect.[31] It includes quantified estimates of national output from three independent sources.[32] It includes a documented $7.8 billion equity acquisition that postdates *Rimkus I* by thirteen months.[33] It includes the Bonyad structure through which the IRGC holds semiprivate monopolies and wins no-bid state contracts,[34] its ownership of two nationally sanctioned media outlets, and its control of Iran's largest football clubs and national federation.[35]

*Rimkus I*'s stated ground does not survive *Holladay II*. *Rimkus I* reasoned that although "the IRGC uses its status as a paramilitary organization to advance its pecuniary interests," "such conduct — even if criminal in nature — does not render the IRGC a commercial entity." 575 F. Supp. 2d at 200. That is a purpose-based inquiry. *Holladay II* holds that "it is not the purpose, but the nature, of the activity that controls," and that market activity remains

---

[30] *See* U.S. Dep't of State, *supra* note 2.
[31] *See* Thomas, *supra* note 1.
[32] *See* NPR, *supra* note 7; Owens, *supra* note 12; Ma, *supra* note 13.
[33] *See* Nat'l Iranian Am. Council, *supra* note 14.
[34] *See* Ma, *supra* note 13.
[35] *See* Owens, *supra* note 12.

commercial even when it "serve[s] public purposes, either by aiming to achieve a policy goal or by seeking to raise revenue for government coffers." 523 F. Supp. 3d at 109–10. Under that rule, the IRGC's purchase of a telecommunications carrier, its construction contracts, its airport, and its media and sports holdings are commercial in nature whatever the corps does with the proceeds. In any event, Plaintiff does not rest on the smuggling evidence *Rimkus I* found unavailing; Plaintiff rests on holdings that involve no coercion at all.

*Rimkus I* framed the ultimate question as whether the IRGC had become "a primarily commercial entity," *id.*, which is the predominance inquiry *Transaero* prescribes, 30 F.3d at 151. *Holladay II* answers how much is enough: a prima facie showing over a "low bar," sufficient even where the commercial-to-governmental proportion "remain[ed] opaque." 523 F. Supp. 3d at 111–12. The present record clears it.

E. Section 1608(b)(3)(C) Permits Service by Electronic Mail to Iran's Permanent Mission and Ministry of Foreign Affairs

If the IRGC is an agency or instrumentality, the remaining question is whether the proposed method is "reasonably calculated to give actual notice" and "consistent with the law of the place where service is to be made." 28 U.S.C. § 1608(b)(3)(C). Three judges of this District have answered that question on materially identical facts.

In *John Farshid Doe v. Islamic Revolutionary Guard Corps*, the Court held that where the methods of service ordinarily prescribed by the statute are unavailable because of the ongoing military conflict between the United States and Iran, it may authorize a method "reasonably calculated to give actual notice" that is "consistent with the law of the place where service is to be made." It found that "service by electronic mail to the Permanent Mission of the Islamic Republic of Iran to the United Nations at iran@un.int satisfies that standard, as the Permanent Mission's role as Iran's diplomatic representation makes it well-suited to ensure that the proper parties receive actual notice." No. 1:26-cv-00334 (CJN), Order at 1 (D.D.C. June 9,

2026) (Ex. F). The defendants there were the IRGC and MOIS. The court authorized service by transmitting the summons, complaint, and required notices with a Farsi translation of each to that address, and directed the filing of a certificate of service within seven days. *Id.* at 1–2. In *Hutan*, the court found good cause to grant alternative service under § 1608(b)(3)(C) "[g]iven the unavailability of service through foreign mail via the Clerk of Court, diplomatic channels, and physical delivery." Minute Order (Apr. 16, 2026) (Ex. E).

*Mahvi* supplies the fullest analysis, and it establishes the factual premise for this same request. Applying *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), the Court found that "Plaintiff's proposed method of service is reasonably calculated to apprise Defendants of this action and afford them the opportunity to respond," because Iran "maintains an official, diplomatic presence with the United Nations in New York and provides the aforementioned email on its Ministry of Foreign Affairs webpage," such that "[i]t is reasonable to assume that the email address Iran has provided would apprise Iran of the pendency of the action and afford it the opportunity to respond." Minute Order (June 18, 2026) (Ex. G). The Court then ordered service by electronic mail to iran@un.int with a Farsi translation of each document and a certificate of service within seven days, and observed that its order "is consistent with those of other courts in this District who recently addressed the same issue," citing *Farshid Doe* and *Hutan*. *Id.* Iran has published the very address Plaintiff proposes as its own channel of communication. Magistrate Judge Upadhyaya granted the same relief again on August 31, 2026, in *Once Doe v. Islamic Republic of Iran*, finding that email to iran@un.int is "reasonably calculated to apprise Defendants of this action and afford them the opportunity to respond," and that "because Defendants IRGC and MOIS are considered to be 'so closely bound up with the structure of the state that [it] must in all cases be considered as the "foreign state" itself,' service to this email address for the IRGC and MOIS are also appropriate." No. 1:26-cv-02507-MAU, Minute Order (D.D.C. Aug. 31, 2026) (Ex. H).

The statute's remaining element is satisfied as well. Section 1608(b)(3)(C) requires that the court-directed method be "consistent with the law of the place where service is to be made." As the court explained in *New England Merchants National Bank v. Iran Power Generation & Transmission Co.*, that language "does not require that service be identical to the method prescribed by the foreign state. Rather, the language indicates that the mode of service authorized by the court should not be *prohibited* under the law of the foreign state," citing H.R. Rep. No. 94-1487, at 25 (1976). 495 F. Supp. 73, 79 n.4 (S.D.N.Y. 1980). "Thus, if a mode of service is not prohibited under Iranian law, and is a means whereby those in charge of the defendant agencies or instrumentalities would receive notice of the action and an adequate opportunity to defend it, then a substitute form of service is permissible under the FSIA." *Id.* Plaintiff is aware of no Iranian law prohibiting the receipt of electronic mail at Iran's own Permanent Mission to the United Nations in New York, and service at that address is in any event effected in the United States rather than in Iran.

*New England Merchants* is also an early instance of a federal court fashioning electronic service on Iranian defendants under this statute. Confronting the severance of diplomatic relations in 1980, the court directed service "in Farsi and English" by telex, together with a mailed copy of the pleadings and an affidavit of compliance filed with the Clerk. 495 F. Supp. at 81. Plaintiff's proposal is the modern equivalent of that order, and it tracks the relief entered in *Once Doe*, *Mahvi*, and *Farshid Doe*.

Independent of those orders, the method satisfies due process. Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314. Where "conditions do not reasonably permit" ordinary notice, the question is whether "the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes." *Id.* at 315. Here there are no other feasible substitutes: mail does not

move, diplomatic shipments do not move, and no process server may enter Iran. Courts have approved email service on this reasoning where it was "the method of service most likely to reach" the defendant. *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1017 (9th Cir. 2002).

F. Independently, If § 1608(a) Governs, Every Prescribed Method Is Unavailable and This Court Has Already Authorized the Same Substitute

Should the Court conclude that the IRGC must be served under § 1608(a), the same relief follows. Section 1608(a) conditions each method on the unavailability of the one before it, every method is presently unavailable, and a Magistrate Judge of this Court authorized email service to iran@un.int on that footing in June 2026, and again in August 2026, in related cases involving the same Defendant, IRGC.

1. The D.C. Circuit Conditions Each Method on the Unavailability of the Last

The governing formulation is the D.C. Circuit's. In *Angellino v. Royal Family Al-Saud*, the Court held that "[s]ection 1608 prescribes four methods of service — 'in descending order of preference' — and a plaintiff 'must attempt service by the first method (*or determine that it is unavailable*) before proceeding to the second method, and so on.'" 688 F.3d 771, 773 (D.C. Cir. 2012) (quoting *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)) (emphasis added); *accord Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015). The parenthetical is the Circuit's. Section 1608(a)(3) is by its terms available only where "service cannot be made under paragraphs (1) or (2)," and § 1608(a)(4) only where "service cannot be made within 30 days under paragraph (3)." Congress wrote unavailability into the statute as the trigger for moving on. Where unavailability is total, the statute's own logic does not require performance of an act that cannot be performed.

2. This Court Has Granted This Relief Under § 1608(a) on These Facts

*Mahvi* is dispositive of this alternative ground. There, a Magistrate Judge of this Court held that "[i]f Plaintiff strictly complied with § 1608(a)'s requirements but was unsuccessful at serving Defendants, Plaintiff may serve Defendants by alternate methods," applied *Mullane*, and authorized service on Iran and the IRGC by electronic mail to iran@un.int with Farsi translations. Minute Order (June 18, 2026) (Ex. G). Notably, the Court reached the IRGC on the premise that it is "so closely bound up with the structure of the state that [it] must in all cases be considered as the 'foreign state' itself," *id.* (quoting *Przewozman*, 628 F. Supp. 3d at 313) — that is, on the very classification premise Plaintiff's primary argument disputes. The relief Plaintiff seeks is therefore available whichever pathway the Court applies. Magistrate Judge Upadhyaya reaffirmed that holding on August 31, 2026 in *Once Doe*, authorizing the same relief as to Iran, the IRGC, and MOIS. Minute Order (Aug. 31, 2026) (Ex. H).

This Court has applied the same principle to the sequencing question. In *Azadeh*, the Court held that although "*Barot* holds that '[w]hen serving a foreign sovereign, "strict adherence to the terms of 1608(a) is required,"' it also describes section 1608(a) as prescribing four methods of service 'in descending order of preference,' not obligation," and concluded that "[n]o conceivable purpose, or interest of Defendants, would be served by requiring her go through that *empty gesture* just so as to preserve the 'order of preference' of methods of service outlined in section 1608(a)." 2018 WL 4232913, at *15 (quoting *Barot*, 785 F.3d at 27) (emphasis added). *Azadeh* drew from *Barot* four considerations: "the district court's statutory responsibilities and prominent role in the mistakes of service in [plaintiff's] case, the prejudice to [plaintiff], the lack of prejudice to the [defendant] Embassy, and [plaintiff's] good-faith efforts at service." *Id.* (quoting *Barot*, 785 F.3d at 29). Each of the considerations that bears on this case favors Plaintiff. The IRGC suffers no prejudice; it has not appeared and will receive the Complaint in Farsi at Iran's own diplomatic mission. Plaintiff's efforts are in good faith; the

*Dehnoushi* court so found in an extremely similar case, holding that "failure to [effect service] in accordance with Section 1608(a) is not attributable to any lack of diligence on their part." 2026 WL 1786419, at *2. And the prejudice to Plaintiff is the kind *Azadeh* found decisive: there, requiring re-service would likely have caused the plaintiff to miss the claim deadline for the United States Victims of State Sponsored Terrorism Fund, "thereby denying her the most realistic path for recovery on any judgment." 2018 WL 4232913, at *15. Plaintiff intends to seek recovery from the same Fund.

3. Congressional Silence Is Not a Prohibition

Congress's failure to address the closure of every prescribed channel is not a judgment that a plaintiff must lose. A court confronting this precise problem has so held. In *New England Merchants*, Iran argued that "Congress, certainly aware of the possibility of international conflict, intentionally made no provision for service under such circumstances," so that "Congressional silence can only mean that the provisions of the FSIA were to be the exclusive method by which process was to be served." 495 F. Supp. at 78. The court rejected that reading, holding that "Congress did not seek to cover the problem of effecting service upon a foreign government should diplomatic channels be closed," that it was "unwilling to adopt defendants' theory that Congressional silence constitutes a total prohibition or requires judicial abstinence," and that "nothing in the FSIA, or the legislative history of the Act . . . prohibits a court from recognizing a mode of service of process when all other prescribed methods have been frustrated." *Id.* at 79. Congress drafted § 1608 in 1976 against requirements "promulgated in contemplation, at the very least, of friendship and of continuing diplomatic ties." *Id.* at 80-81.

The statute's structure confirms the point. Service through diplomatic channels under § 1608(a)(4) is "a method of last resort," and unlike the other methods of service on a foreign state it requires no signed receipt to be complete, just as court-fashioned service under § 1608(b)(3)(C) does not. *Id.* at 79 (comparing 28 U.S.C. § 1608(c)(1) with § 1608(c)(2)). Section

1608(a)(4) "was intended to serve the same purpose as the substitute service provision in the section dealing with the agencies or instrumentalities of a foreign state." *Id.* at 78–79. Where the foreign state's own conduct has closed that provision, recognizing a substitute vindicates the mechanism Congress supplied rather than displacing it. And as that court observed, "[n]o longer must process be mailed to a defendant's door when he can receive complete notice at an electronic terminal inside his very office, even when the door is steel and bolted shut." *Id.* at 81; *see Rio Props.*, 284 F.3d at 1017 (quoting the passage and agreeing "wholeheartedly"). Plaintiff acknowledges that *New England Merchants* is a 1980 decision of the Southern District of New York and is not binding, and that its alternative holding rested on Federal Rules of Civil Procedure 4(e) and 4(i) as they then existed; the reasoning above is grounded in the FSIA itself.

4. The Circumstances Are Extraordinary

Even on the strictest view of § 1608(a), the Fifth Circuit has recognized that "under extraordinary circumstances . . . when service of process according to the express provisions of § 1608(a) is a manifest impossibility, other methods of service that fully satisfy the goals of section 1608(a) might be sufficient." *Magness v. Russian Fed'n*, 247 F.3d 609, 615 n.15 (5th Cir. 2001). Plaintiff cites *Magness* not as controlling authority but for the proposition that a federal court of appeals, applying the same strict-compliance rule this Circuit applies, has recognized that manifest impossibility may present a different case, and has invited the showing when the circumstances arise. Those circumstances are present. Here, the United States and Iran have been engaged in armed hostilities that began on February 28, 2026, a conflict in which Iran's Supreme Leader was killed in a United States and Israeli airstrike and in which the commander of the IRGC and numerous other senior Iranian officials have been killed.[36] The Postal Service and every major commercial carrier have suspended service to Iran. Exs. B–D.

---

[36] *See* Ma, *supra* note 13.

And the Department of State has confirmed that documents cannot be transmitted between Bern and Tehran in either direction, Ex. A, having held undersigned counsel's § 1608(a)(4) request in *Dehnoushi* for over a year without effecting service, *see supra* Part I.C. Nor does the relief sought abandon the goals of § 1608(a), which are notice to the entity best positioned to understand and respond to American process. *See Transaero*, 30 F.3d at 154. Service on Iran's Permanent Mission and on the Ministry of Foreign Affairs, in Farsi, serves those goals directly; § 1608(a)(3) itself designates the Ministry of Foreign Affairs as the recipient.

G. Where Congress Has Not Spoken, the Constitution Guides the Relief: Section 1608 Cannot Be Applied to Destroy a Blameless Plaintiff's Federal Claim

Section 1608 should be construed to permit the relief Plaintiff seeks because the alternative construction raises a serious constitutional question. Plaintiff's § 1605A claim is property protected by the Fifth Amendment. A procedural statute may not be applied to extinguish that property where compliance is impossible through no fault of the claimant, and this Court is the only forum in which the claim can be heard. Congress did not address the contingency that has arisen, *see supra* Part III.F.3, and where the statute is silent the Constitution supplies the principle that guides the Court's discretion.

1. Plaintiff's Filed Cause of Action Is Property Protected by the Fifth and Fourteenth Amendments

The deprivation Plaintiff seeks to avoid would not be inflicted by Iran, and it would not be inflicted by any State. It would be worked by a federal court, applying a federal statute, to extinguish a federal claim.

Three settled propositions frame the question. First, a filed cause of action is constitutionally protected property subject to the protections of the Fifth and Fourteenth Amendments' Due Process Clauses. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *accord Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988) ("Little

doubt remains that such an intangible interest is property protected by the Fourteenth Amendment.”). Nothing in that holding is confined to the States. *Logan* announced it as a proposition of both Due Process Clauses, and it placed the plaintiff's side of the principle squarely under the Fifth: "The Court traditionally has held that the Due Process Clauses protect civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances." 455 U.S. at 429.

Second, that property cannot be defined out of existence by the procedures attached to it. “‘Property’ cannot be defined by the procedures provided for its deprivation any more than can life or liberty.” *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). The vice *Logan* identified was not agency error but “the ‘established state procedure’ that destroys his entitlement without according him proper procedural safeguards.” 455 U.S. at 436. The federal analogue is exact. No one has erred here. It is § 1608 itself, applied to a plaintiff who cannot perform it, that would destroy the claim.

Third, and decisively here, a litigant may not be stripped of a claim as a penalty for a failure that was never within his power to avoid. This third proposition comes from a case whose facts are closer to this one than any other in the reports. In *Société Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers*, the Supreme Court held that the Rules of Civil Procedure “must be read in light of the provisions of the Fifth Amendment that no person shall be deprived of property without due process of law,” and set aside the dismissal of a complaint where the plaintiff’s “failure to satisfy fully the requirements of this production order was due to inability fostered neither by its own conduct nor by circumstances within its control.” 357 U.S. 197, 209, 211 (1958). The Court grounded that rule in the settled principle that a litigant may not be penalized “for a failure to do that which it may not have been in its power to do.” *Id.* at 210 (quoting *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 347 (1909)). The impediment there was the law of a foreign sovereign, and the Court held that the

excuse "is not weakened because the laws preventing compliance are those of a foreign sovereign." *Id.* at 211. *Pope* applies the same principle to a third-party impediment, refusing to let a nonclaim statute extinguish a creditor's claim where the failure to comply was the executor's rather than the claimant's. 485 U.S. at 487–91.

The access-to-courts cases supply the remedial framework. Where the courts are the only avenue for the vindication of a right, "absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Boddie v. Connecticut*, 401 U.S. 371, 376–77 (1971). And the remedy is narrow: a facially valid rule "may be held constitutionally invalid as applied when it operates to deprive an individual of [a] protected right," *id.* at 379, leaving the statute intact in every case in which it can function.

2. The Impossibility Is Not of Plaintiff's Making, and Its Indefinite Duration Works the Same Deprivation as a Dismissal

Each element stated in Part III.G.1 is present. Plaintiff has filed a nonfrivolous claim under a cause of action Congress expressly created for United States nationals injured by state sponsors of terrorism. 28 U.S.C. § 1605A. A federal district court is the only forum in which that claim can be heard, and § 1608 is the only route to it, so the exclusive jurisdiction *Boddie* requires is complete rather than approximate. Every method § 1608 prescribes is presently incapable of performance. *See supra* Parts I.C, III.F. And the impossibility is not Plaintiff's doing: it is the product of Defendants' own conduct in prosecuting a war against the United States, of the Postal Service's and the carriers' suspensions, and of the Department of State's inability to transmit documents to Tehran, an inability that predates the conflict by more than a year in a related case. *See supra* Part I.C. Under *Société Internationale*, that is the paradigm of an inability "fostered neither by [Plaintiff's] own conduct nor by circumstances within [his]

control," 357 U.S. at 211, and the Fifth Amendment does not permit the claim to be forfeited as the penalty for it.

The deprivations in many of these cases took the form of an accomplished dismissal or a closed limitations period, while Plaintiff's claim remains nominally pending on this Court's docket. The distinction is one of form rather than of substance, and it results in the same injury. The hostilities that closed every prescribed channel of service began in February 2026 and continue with no resolution in sight, and the Department of State has been unable to effect service upon this same Defendant in a related matter for more than a year. *See supra* Parts I.C, III.F. A claim that cannot be served cannot be prosecuted, and a claim that cannot be prosecuted for an indefinite and unbounded period is not preserved by the fact that no order has yet dismissed it. The vice these cases identify is the operation of a procedure that forecloses "a hearing on the merits of his cause," *Société Internationale*, 357 U.S. at 209, not the caption of the order that accomplishes it. Plaintiff stands in the position of the claimants in *Logan*, *Pope*, and *Société Internationale*. Plaintiff is a United States national, injured by state-sponsored terrorism, seeking the one remedy Congress created for victims like him. Plaintiff has done everything the statute asks – what separates him from a hearing is a war Defendant is prosecuting against the United States, which has definitively closed every channel § 1608 prescribes. With no end in sight and no alternative in prospect, the circumstances leave him and every American national holding a § 1605A claim against this Defendant with no present or foreseeable access to a court. Process withheld indefinitely is effectively the same as process denied.

Plaintiff anticipates *Mark v. Republic of the Sudan*, 77 F.4th 892 (D.C. Cir. 2023), and submits that it points the other way. There the D.C. Circuit rejected an access-to-courts challenge to Congress's restoration of Sudan's sovereign immunity, reasoning that the plaintiffs had made no showing "that systematic official action frustrated them in their ability to file or

prepare a lawsuit or that [the] government caused their suit to be dismissed as untimely or rendered hollow their right to seek redress." *Id.* at 898. *Mark* concerned Congress's exercise of its authority over federal jurisdiction, which is a legislative judgment not to confer a right. This case is the opposite posture: Congress *did* confer the right, and it is the operation of a service provision, applied to a plaintiff who cannot comply, that would render that right hollow. *Mark*'s own formulation therefore describes the injury Plaintiff seeks to avoid rather than foreclosing the argument.

What Plaintiff asks of the Court is correspondingly modest. Plaintiff does not ask the Court to hold § 1608 unconstitutional, to excuse defective service, or to dispense with notice. Plaintiff asks the Court to choose, between two available readings of a silent statute, the one that does not extinguish a federal claim that Congress created and that no one contends is frivolous. That choice is well within the Court's authority, especially given that **the grant of alternative service is a recognized power under § 1608**. As the Second Circuit observed before the FSIA was enacted, "the fashioning of provisions with respect to service on foreign governments is a task peculiarly appropriate for federal courts." *Petrol Shipping Corp. v. Kingdom of Greece*, 360 F.2d 103, 109-110 (2d Cir. 1966). And this Court has administered § 1608(a) with that flexibility, declining to dismiss where a plaintiff's good-faith attempt at service on a foreign state proved defective and instead invoking its "substantial discretion" under Federal Rule of Civil Procedure 4(m) to permit "additional time to effect service by alternative means." *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 225 F. Supp. 3d 18, 23 (D.D.C. 2014). The construction Plaintiff urges gives Defendants the notice § 1608 exists to provide, in Farsi, at Iran's own diplomatic mission, by an effective means. The construction Plaintiff resists gives Defendants a permanent immunity from a statute Congress wrote to reach them.

## IV. CONCLUSION

The IRGC is not the "armed forces of Iran"; it is a commercial entity, built by Iran's clerical leadership, and it maintains its own land, air, and naval components alongside the ones the state already had. It is not a department accountable to the Government of Iran; its budget sits outside the government's and its conglomerates are shielded from oversight. What it is, on the record submitted with this motion and on the findings of the Department of State and the Congressional Research Service, is:

(a) the controlling commercial actor in the Iranian economy,

(b) holding somewhere between half and two-thirds of national output across:

i. oil,
ii. banking,
iii. telecommunications,
iv. construction,
v. transportation,
vi. media, and
vii. consumer imports.

Under the predominance test the D.C. Circuit adopted in *Transaero* and the evidentiary standard this Court applied in *Holladay II*, the IRGC is an agency or instrumentality of a foreign state and may be served under 28 U.S.C. § 1608(b)(3)(C).

Should the Court conclude otherwise, the result is the same. Every method § 1608(a) prescribes is unavailable, and a Magistrate Judge of this Court has twice authorized service by electronic mail to iran@un.int as to these Defendants on that basis.[37] Reading § 1608 to leave Plaintiff without recourse would attribute to Congress a purpose it never expressed. Congress enacted the terrorism exception to open the courthouse to United States nationals injured by

---

[37] Three judges in this District have found this particular alternative service method valid under § 1608. *See Mahvi*, No. 1:25-cv-00059-TNM-MAU, Minute Order (D.D.C. June 18, 2026; *John Farshid*, No. 1:26-cv-00334 (CJN), Order (D.D.C. June 9, 2026); *Hutan*, No. 1:25-cv-00837-ACR, Minute Order (D.D.C. Apr. 16, 2026).

state sponsors of terrorism, and it did not address what should happen when the sponsor closes every prescribed channel by making war on the United States. Silence on a contingency Congress never confronted is not a judgment that the plaintiff must lose. *See New England Merchants*, 495 F. Supp. at 79. Nor may a procedural provision be applied to extinguish a federal claim that is itself constitutionally protected property, where compliance is impossible through no fault of Plaintiff's. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *Société Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 209, 211 (1958). Whether the Court proceeds under § 1608(b)(3)(C) or under § 1608(a), the relief Plaintiff seeks would give Defendants, in Farsi and at Iran's own diplomatic mission, the notice the statute exists to provide.

Plaintiff respectfully requests that the Court:

(1) Authorize Plaintiff to serve Defendant Islamic Revolutionary Guard Corps, pursuant to 28 U.S.C. § 1608(b)(3)(C), by transmitting the summons, the Complaint, the Notice of Suit, and all required attachments, together with a Farsi translation of each, by electronic mail to the Permanent Mission of the Islamic Republic of Iran to the United Nations at iran@un.int and to the Ministry of Foreign Affairs of the Islamic Republic of Iran at info@mfa.gov.ir;

(2) In the alternative, if the Court concludes that 28 U.S.C. § 1608(a) governs service upon the Islamic Revolutionary Guard Corps, authorize the same method of service on the ground that the methods prescribed by § 1608(a) are unavailable;

(3) Direct Plaintiff to file a certificate of service within seven (7) days of effecting service; and

(4) Grant such other and further relief as the Court deems just and proper.

Pursuant to LCvR 7(c), a proposed order is submitted herewith. Conferral under LCvR 7(m) is impracticable because no Defendant has been served and no counsel has appeared.

Dated: September 2, 2026

Respectfully submitted,

/s/ Jeffrey D. Katz
Jeffrey D. Katz (Bar No. 17071)
Jared B. Stape (Bar No. MD0215)
JDKATZ, P.C.
4800 Montgomery Lane, Suite 600
Bethesda, MD 20814
(301) 913-2948
Jeffrey@JDKatz.com
Jared@JDKatz.com
Attorneys for Plaintiff Ocho Doe